Bradley P. Boyer (SBN 179430)
**KUTAK ROCK LLP**
777 South Figueroa Street, Suite 4550
Los Angeles, California 90017-5800
Telephone: (213) 312-4000
E-Mail: bradley.boyer@kutakrock.com
Authorized E-Service:
LAIntake@kutakrock.com

Victoria H. Buter
(*Pro Hac Vice forthcoming*)
Thomas H. Dahlk
(*Pro Hac Vice forthcoming*)
**KUTAK ROCK LLP**
Omaha Building
1650 Farnam Street
Omaha, Nebraska 68102
Telephone: (402) 346-6000
E-Mail: vicki.buter@kutakrock.com
E-Mail: tom.dahlk@kutakrock.com

Attorneys for Plaintiffs
ETHAN MEVI, ENRIQUE CURBELLO,
BRUCE BRADLEY, MICHAEL BROOME,
CYNTHIA BROOME, ALADDIN ASFOUR,
KYLE HODES, JENNIFER HODES,
ALEXANDER ESPALIN, MOAYAD
ALTAHHAN, SHAWN FRANZ, LEO
KISHKO, and AC CHOUDHURY

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ETHAN MEVI, an individual, ENRIQUE CURBELLO, an individual, BRUCE BRADLEY, an individual, MICHAEL BROOME, an individual, CYNTHIA BROOME, an individual, ALADDIN ASFOUR, an individual, KYLE HODES, an individual, JENNIFER HODES, an individual, ALEXANDER ESPALIN, an individual, MOAYAD ALTAHHAN, an individual, SHAWN FRANZ, an individual, LEO KISHKO, an individual,; and AC CHOUDHURY, an individual <br><br> Plaintiffs, <br><br> v. <br><br> HENRY JI, an individual, M3 ADVISORY PARTNERS, L.P., a Delaware limited partnership, MIII | Case No.  **'26 CV 2113 DMS DEB** <br><br> Assigned to Judge: <br><br> **COMPLAINT FOR RACKETEERING INFLUENCED CORRUPT ORGANIZATIONS ACT ("RICO") 18 U.S.C. § 1962(C); CONSPIRACY TO VIOLATE RICO, 18 U.S.C. § 1962(D); BREACH OF FIDUCIARY DUTY; AIDING AND ABETTING BREACH OF FIDUCIARY DUTY; VIOLATION OF CALIFORNIA PENAL CODE SECTION 496; AND BREACH OF FIDUCIARY DUTY** <br><br> **DEMAND FOR JURY TRIAL** |

- 1 -

COMPLAINT AND DEMAND FOR JURY TRIAL

4906-4721-6185

PARTNERS, L.P. , a limited partnership, MOHSIN MEGHJI, an individual, JACKSON WALKER LLP, a limited liability partnership, DORMAN FOLLOWWILL, an individual, KIM D. JANDA, an individual, DAVID LEMUS, an individual, TAMMY REILLY, an individual, JAISIM SHAH, an individual, YUE ALEXANDER WU, an individual; STEPHEN MA, an individual; VIVASOR HOLDING COMPANY, a corporation; SCILEX HOLDING COMPANY, a corporation; and SEMNUR PHARMACEUTICALS, Inc., a corporation,

Defendants.

Plaintiffs Ethan Mevi, Enrique Curbello, Bruce Bradley, Michael Broome, Cynthia Broome, Aladdin Asfour, Kyle Hodes, Jennifer Hodes, Alexander Espalin, Moayad Altahhan, Shawn Franz, Leo Kishko, and AC Choudhury (collectively, "Plaintiffs"), for their Complaint against Defendants, allege as follows:

## NATURE OF THE ACTION

1. Plaintiffs bring this action against Defendants seeking to recover the damages Plaintiffs suffered as a proximate result of, among other things, Defendants' violations of the Racketeering Influenced Corrupt Organizations Act ("RICO") and breaches of their fiduciary duties resulting from a conspiracy among Defendants to file a fraudulent bankruptcy of Sorrento Therapeutics, Inc. ("Sorrento"), and then use the sham bankruptcy to allow Henry Ji and his affiliated companies and business partners to take control of the assets of Sorrento for a fraction of their fair market value, to the direct injury of Plaintiffs as set forth herein.

## PARTIES, JURISDICTION AND VENUE

2. Plaintiff Ethan Mevi was an equity shareholder of Sorrento at the time Sorrento filed for bankruptcy and is, and at all relevant times was, a citizen and resident of California.

3. Plaintiff Enrique Curbelo was an equity shareholder of Sorrento at the time Sorrento filed for bankruptcy and is, and at all relevant times was, a citizen and resident of California.

4. Plaintiff Bruce Bradley was an equity shareholder of Sorrento at the time Sorrento filed for bankruptcy and is, and at all relevant times was, a citizen and resident of Massachusetts.

5. Plaintiffs Michael Broome and Cynthia Broome, husband and wife, were equity shareholders of Sorrento at the time Sorrento filed for bankruptcy and are, and at all relevant times were, citizens and residents of Washington.

6. Plaintiff Aladdin Asfour was an equity shareholder of Sorrento at the time Sorrento filed for bankruptcy and is, and at all relevant times was, a citizen of the country of Jordan.

7. Plaintiffs Kyle Hodes and Jennifer Hodes, husband and wife, were equity shareholders of Sorrento at the time Sorrento filed for bankruptcy and are, and at all relevant times were, citizens and residents of Tennessee.

8. Plaintiff Alexander Espalin was an equity shareholder of Sorrento at the time Sorrento filed for bankruptcy and is, and at all relevant times was, a citizen and resident of Georgia.  Mr. Espalin was also a creditor of Sorrento, and he was denied a position on the Official Committee of Unsecured Creditors in 2024, for the stated reason that any level of equity ownership created an inherent conflict of interest.

9. Plaintiff Moayad Altahhan was an equity shareholder of Sorrento at the time Sorrento filed for bankruptcy and is, and at all relevant times was, a citizen of the country of Saudi Arabia.

10. Plaintiff Shawn Franz was an equity shareholder of Sorrento at the time Sorrento filed for bankruptcy and is, and at all relevant times was, a citizen and resident of Maryland.

KUTAK ROCK LLP
ATTORNEYS AT LAW
LOS ANGELES

- 3 -

COMPLAINT AND DEMAND FOR JURY TRIAL

4906-4721-6185

11. Plaintiff Leo Kishko was an equity shareholder of Sorrento at the time Sorrento filed for bankruptcy and is, and at all relevant times was, a citizen and resident of Massachusetts.

12. Plaintiff AC Choudhury was an equity shareholder of Sorrento at the time Sorrento filed for bankruptcy and is, and at all relevant times was, a citizen and resident of Texas.  Mr. Choudhury was an active member of Official Equity Committee and had multiple telephone calls and email exchanges with Sorrento and Scilex executives throughout 2023 and 2024.

13. Plaintiffs collectively owned over 10 million shares of Sorrento's 550 million outstanding shares at the time Sorrento filed for bankruptcy on February 13, 2024, and collectively paid over $57 million for their shares of Sorrento and affiliated companies.

14. Defendant Henry Ji ("Ji") was Sorrento's CEO, Chairman of the Board of Directors, controlling shareholder, and founder, and at all relevant times performed his duties on many occasions while physically present in the Southern District of California.  Ji is now also executive chairman, CEO and president of Scilex and Semnur.  Ji is a citizen and resident of California.

15. Defendant Mohsin Y. Meghji ("Meghji") was Sorrento's Chief Restructuring Officer and at all relevant times knew that his actions would affect Sorrento (and its equity shareholders) in the Southern District of California. Meghji is managing partner of Defendant M3 Advisory Partners, LP ("M3"), which has a place of business at 1700 Broadway, 19th Floor, New York, New York 10019.  Upon information and belief, Meghji is a citizen and resident of New York.

16. Defendant M3 Advisory Partners LP and MIII Partners, L.P. ("M3") are limited partnerships organized under the laws of the State of Delaware.  Upon information and belief, M3's principal place of business is in New York, New York.

///

KUTAK ROCK LLP
ATTORNEYS AT LAW
LOS ANGELES

- 4 -

COMPLAINT AND DEMAND FOR JURY TRIAL

4906-4721-6185

17. As of February 13, 2023, the following individual Defendants were members of Sorrento's Board of Directors or otherwise associated with Ji and Sorrento:

(a)   Defendant Dorman Followwill was a Member of the Board of Directors and the Lead Independent Director for Sorrento at all times relevant to this action. He was also a board member of Scilex at all times relevant to this action. Followwill may be served at 1092 Mountain Oak Place, Newbury Park, CA 91320.

(b)   Defendant Kim Janda was a Member of Sorrento's Board of Directors at all times relevant to this action. Janda may be served at 5787 La Jolla Corona Drive, La Jolla, CA 92037.

(c)   Defendant David Lemus was a Member of Sorrento's Board of Directors at all times relevant to this action. He was also a board member of Scilex at all times relevant to this action. Lemus may be served at 11004 S. Glen Road, Potomac, MD 20854.

(d)   Defendant Tammy Reilly was a Member of Sorrento's Board of Directors at all times relevant to this action until she resigned effective October 25, 2023, in protest to the conduct of Meghji during the bankruptcy.  Reilly may be served at 601 Biddle Street, Chesapeake City, MD 21915.

(e)   Defendant Jaisim Shah, until his retirement on March 13, 2026, was a Member of Sorrento's Board of Directors at all times relevant to this action, a board member, CEO, and President of Scilex at all times relevant to this action, and  CEO of Semnur at all times relevant to this action.  Shah may be served at 212 Monroe Drive, Mountain View, CA 94040.

(f)   Defendant Yue Wu was a Member of Sorrento's Board of Directors at all times relevant to this action. He was also a board

KUTAK ROCK LLP
ATTORNEYS AT LAW
LOS ANGELES

COMPLAINT AND DEMAND FOR JURY TRIAL

4906-4721-6185

member of Scilex at all times relevant to this action. Wu may be served at 1960 Noel Drive, Los Altos, CA 94024.

(g)   Defendant Stephen Ma was a Member of Scilex's Board of Directors at all times relevant to this action and is its current CFO and COO. Ma was hand-picked by Ji and served as Scilex's Chief Accounting Officer since November 2022 and was involved in the decision-making and co-architecting the process of both Scilex's decision to fund the $20 million junior DIP loan to Sorrento and, more importantly, was involved in making sure Scilex paid the lowest amount possible for its bid on Sorrento's Scilex shares. Ma may be served at 960 San Antonio Road, Palo Alto, California, 94303.

18. Defendant Jackson Walker LLP ("Jackson Walker") is a national full-service law firm formed under the laws of the State of Texas that serves clients worldwide and provides services across the United States, including the Southern District of California. At all relevant times herein, Jackson Walker took actions that subjected it to the jurisdiction of this Court, and it knew that Sorrento's principal place of business was in the Southern District of California.

19. Vivasor Holding Company ("Vivasor") is a Delaware corporation, and is headquartered in San Diego, California, and Defendant Ji is its controlling shareholder, CEO and Chairman.

20. Defendant Scilex Holding Company ("Scilex") is a former Sorrento subsidiary that was spun out as a Nasdaq-listed public company in November 2022 and is organized under the laws of the State of Delaware and headquartered in Palo Alto, California. Scilex announced on April 1, 2026, that it's merging with Vivasor.

///

///

Kutak Rock LLP
Attorneys At Law
Los Angeles

- 6 -

COMPLAINT AND DEMAND FOR JURY TRIAL

4906-4721-6185

21. Defendant Semnur Pharmaceuticals, Inc. ("Semnur"), a clinical late-stage specialty pharmaceutical company focused on the development and commercialization of novel non-opioid pain therapies, is a Delaware corporation headquartered in Palo Alto, California.

22. (a) The Court has original jurisdiction over Plaintiffs' civil RICO claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

(b) Venue is proper in this Court based on 28 U.S.C. § 1391(b)(2) because many of the events or omissions giving rise to the claims occurred or caused injury to Plaintiffs within this judicial district.  Venue is otherwise proper under 28 U.S.C. § 1391(b)(3) because each of the Defendants is subject to this Court's personal jurisdiction.  The RICO statute authorizes nationwide service of process, and in the Ninth Circuit personal jurisdiction is obtained if the court is authorized to obtain service over the defendant.  Under 18 U.S.C. § 1965(a), venue is proper in any district in which a defendant "resides, is found, has an agent, or transacts his affairs" and, in addition, 18 U.S.C. § 1965(b) provides that as long as one defendant is subject to service in a district, additional parties may be brought before the forum court, in the court's discretion, to the extent that "the ends of justice require."

## RELEVANT BACKGROUND

23. At all relevant times, Plaintiffs were significant noncontrolling equity holders of Sorrento, a Delaware corporation, with its principal place of business in San Diego, California, and they have each suffered direct injury as a proximate result of Defendants' tortious and unlawful acts as alleged herein; the Sorrento/Scintilla bankruptcies would never have been filed and certainly would never have been filed in the United States Bankruptcy Court for the Southern District of Texas but for the unlawful actions committed by Defendants as described herein.

24. (a) Sorrento was an international biopharma/tech company with numerous assets focused on oncology, immunotherapy, cell therapy, non-opioid pain and infectious disease treatments and diagnostics.

(b) Between late 2019 and early 2020, the Sorrento board rejected multiple buyout offers ranging from a half billion to a billion dollars for the company's immature assets.

(c) In early 2020, Sorrento's board took nearly a month's time to unanimously reject a $1 billion offer from an unnamed private equity firm, stating at the time that the deal "significantly undervalues the company and is not in the best interest of the shareholders."

(d) Instead of selling its assets, Sorrento continued to develop its pipeline of medical therapies and diagnostics to become a fully vertically integrated megacap biopharma/tech company.

25. At all relevant times, Sorrento maintained its principal place of business in San Diego, California (the "San Diego Office"), and never had an office, asset or presence in the Southern District of Texas.

26. At all relevant times, Defendant Ji was the CEO of Sorrento and Chairman of Scilex. Ji was the de facto controlling shareholder of Sorrento and responsible for the operations of Sorrento, guided by his duly-appointed Board of Directors, most of whom were also on Scilex's Board of Directors. In their respective roles, Ji and the Board of Directors owed fiduciary and other duties to Plaintiffs.

27. In 2020, in a compensation package approved by Sorrento's Board of Directors, Ji was reported to be the highest paid CEO in the biopharma industry, receiving a compensation package in excess of $163 million. When questioned in 2021, Ji represented that Sorrento would soon have a $200-400 billion market valuation, revising his prior year's representation that Sorrento's market valuation would be $100 billion by 2025.

KUTAK ROCK LLP
ATTORNEYS AT LAW
LOS ANGELES

- 8 -

COMPLAINT AND DEMAND FOR JURY TRIAL

4906-4721-6185

28. Ji's leadership was not without critics.  Lawsuits were filed during the 10 years preceding Sorrento's filing of its fraudulent bankruptcy on February 13, 2023, alleging mismanagement, self-dealing and gross neglect by Ji, but the lawsuits were ultimately settled without material consequences.

29. This successful track record of resolving litigation ended in December 2022, however, when Ji's nearly decade-long feud with billionaire rival Patrick Soon-Shiong, MD, resulted in an adverse arbitration award in the amount of $175 million.

30. While this $175 million award should have been offset by another $125 million arbitration ruling in Sorrento's favor, it was reduced to judgment and used by Defendants as a pretext to file a sham bankruptcy in a bankruptcy forum that enabled Defendants to control the bankruptcy proceedings in the unlawful and wrongful manner described herein and manipulate the outcome to ultimately benefit Ji and the other Defendants, which caused significant damage to Plaintiffs.

**A.    Fabrication of Venue in the Bankruptcy Court of the Southern District of Texas**

31. Despite having a strong balance sheet in 2023 with no secured debt, and ample access to equity and debt markets directly and through its subsidiaries like Scilex, on February 13, 2023, Sorrento (guided by Defendants Ji, Meghji, M3 and Jackson Walker) filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court").

32. In the brief time Ji and the Sorrento Board of Directors were considering the filing of the bankruptcy, upon information and belief, it became readily apparent that a legitimate restructuring or financing process was not necessary and was not the best course of action for Sorrento considering its balance sheet, its performing affiliated entities, its projected future opportunities, and the tremendous expense of the bankruptcy process.

33. Despite these readily apparent facts, Ji used willing and able co-conspirators who were handsomely rewarded with over $50 million in direct fees (over $13.6 million directly to M3 and Jackson Walker, an amount roughly equivalent to Sorrento's actual pre-bankruptcy trade claims) for working in concert with Ji and the Sorrento Board of Directors to use an ethically-compromised bankruptcy forum that would allow Ji to fraudulently obtain control of Sorrento's assets at the end of the bankruptcy, paying a fraction of what the assets were actually worth.

34. Ji and Meghji, and upon information and belief, the Sorrento Board of Directors, conspired with other employees of M3 and Jackson Walker to concoct and execute a plan that would allow Sorrento, an entity that had its principal place of business in the State of California and, upon information and belief, had no corporate contacts with the State of Texas, to file for bankruptcy in the Bankruptcy Court where Meghji and Jackson Walker had established an improper relationship to an ethically compromised bankruptcy court headed by Chief Bankruptcy Judge David R Jones.

35. As part of this conspiracy and in order to establish a supposed presence in Texas, two days before the Scintilla/Sorrento bankruptcy filings, on February 11, 2023, a Jackson Walker lawyer (and recent law clerk of Judge Jones), Veronica Polnick, rented a mailbox (the "UPS Mailbox") on behalf of Scintilla (an inactive wholly-owned subsidiary of Sorrento with no business operations or employees) at a UPS Store located at 7 Switchbud Place, The Woodlands, Texas and directed Stretto to open a checking account where $60,000 was wired from a Sorrento bank account into a new Signature Bank checking account that was purportedly opened in a representative office (not an actual bank branch) in Houston, Texas to provide the appearance that Scintilla ( an inactive subsidiary of Sorrento) had assets in Texas.

///

///

KUTAK ROCK LLP
ATTORNEYS AT LAW
LOS ANGELES

- 10 -

COMPLAINT AND DEMAND FOR JURY TRIAL

4906-4721-6185

36. Having established a phony presence in the State of Texas, on February 13, 2023 (the "Petition Date"), Scintilla (an entity that had not been operating nor generating revenue for years and the existence of which, Sorrento's CFO, Elizabeth Czerepak, had no knowledge until the filing of the bankruptcy) commenced a Chapter 11 Bankruptcy Case in the Bankruptcy Court.

37. Sorrento (which had no material presence in Texas) then filed a separate Petition in the Bankruptcy Court immediately after the Scintilla Petition was docketed to ensure the bankruptcy cases were consolidated.

38. At all relevant times, Ji was Scintilla's sole officer and director.

39. In its petition for bankruptcy relief, Scintilla then listed the UPS Mailbox opened on February 11, 2023, as its principal place of business despite never having conducted any "business" for years, let alone in connection with the UPS Mailbox.

40. Neither Scintilla nor Sorrento were registered or licensed to do business in Texas.

41. In its separate petition for bankruptcy relief, Sorrento listed the San Diego Office as both its principal place of business and as its mailing address, but because Scintilla's bankruptcy was already "pending" in the Bankruptcy Court, Sorrento represented in its Petition that venue was appropriate in the United States Bankruptcy Court for the Southern District of Texas.

42. Therefore, venue for both the Scintilla and Sorrento bankruptcy was grounded solely on the rented UPS Mailbox established by Jackson Walker.

43. In furtherance of the scheme to establish a fraudulent venue for the bankruptcy filings in the State of Texas, three days before the Petition Date, on February 10, 2023, Sorrento wired $60,000 to a newly opened Signature Bank checking account bearing the name of Scintilla.

44. While this bank account was presumably opened to help establish a link to the Southern District of Texas, no funds were deposited in Texas because Signature Bank only had a representative office, not a bank branch, in Texas.

KUTAK ROCK LLP
ATTORNEYS AT LAW
LOS ANGELES

COMPLAINT AND DEMAND FOR JURY TRIAL

4906-4721-6185

45. Because Scintilla was inactive, the $60,000 deposited in this newly opened bank account was Scintilla's only asset on the Petition Date.

46. On the Petition Date, rather than raising questions about the propriety of the bankruptcy venue, the Bankruptcy Court immediately ordered joint administration of the Sorrento and Scintilla (together, the "Debtors") cases.

**B.    The Bankruptcy Court's Rise as a Preferred Venue for Mega Corporate Reorganizations and Jackson Walker's Role in This Ascendancy**

47. In 2015, when Bankruptcy Judge David Jones was appointed Chief Judge of the Bankruptcy Court, the Bankruptcy Court for the Southern District of Texas has been described as a "bankruptcy backwater."

48. As part of a plan to attract high dollar complex Chapter 11 bankruptcies to be filed in the Bankruptcy Court, Chief Judge Jones eventually signed a General Order in 2018 that directed all complex Chapter 11 cases filed in the Bankruptcy Court to two judges—himself and Judge Marvin Isgur, one of his former law partners and mentors, who also had become a bankruptcy judge.

49. According to an investigation by *The Financial Times*, the "guaranty of case assignment to one of two judges who want[ed] to attract mega-cases and under[stood] the need to 'sell' the venue to debtors" enabled the marketing of the Bankruptcy Court's venue to large corporate debtors, including Sorrento.

50. Chief Judge Jones knew that the Bankruptcy Court needed to devise a way to project its willingness and ability to deliver the accommodation needed to attract the mega-bankruptcies to be filed in the Bankruptcy Court.

51. Defendant Jackson Walker played an integral role in the plan to attract mega-bankruptcies to the Bankruptcy Court and directly benefited when the Bankruptcy Court's venue became an attractive venue for large corporate debtors.

52. In 2018, Chief Judge Jones' permanent law clerk, Elisabeth Freeman, resigned her law clerk position to become a partner in Jackson Walker.

///

KUTAK ROCK LLP
ATTORNEYS AT LAW
LOS ANGELES

- 12 -

COMPLAINT AND DEMAND FOR JURY TRIAL

4906-4721-6185

53. Ms. Freeman had been a law clerk for Judge Jones from 2011 to 2018 and had followed Judge Jones from the Porter Hodges law firm when he became a bankruptcy judge in 2011.

54. Freeman and Judge Jones began a romantic relationship during this period and, in 2017, they began living together.

55. Upon the addition of Freeman as a partner in Jackson Walker's bankruptcy group in 2018, Jackson Walker quickly became the leading Houston law firm hired by corporate debtors that filed for bankruptcy in the Bankruptcy Court.

56. By 2022 and continuing in 2023, Jackson Walker led the nation in local counsel appointments in large bankruptcies according to *The Financial Times*, which has also reported that "Jackson Walker was useful as a back channel" to two of Houston's bankruptcy judges: "Freeman had previously been a clerk to [Chief Judge] Jones while another bankruptcy partner, Matthew Cavenaugh[,] had clerked for [Judge] Isgur."  Sujeet Indap, "The downfall of the judge who dominated bankruptcy in America," *The Financial Times* (Nov. 21, 2023).

57. Following Freeman's arrival as a partner at Jackson Walker in 2018, Chief Judge Jones reportedly presided over at least 33 cases in which the Bankruptcy Court awarded Jackson Walker over $23 million in attorneys' fees and expenses.

**C.     M3 and Meghji's Role in Promoting the Bankruptcy Court**

58. Meghji and his firm, M3, were significant participants in the rise of the Bankruptcy Court as a favorite venue for mega corporate bankruptcies, and their relationship with the Bankruptcy Court was evident in April 2022 when the New York City-based Meghji hosted an expensive party for two judges of the Bankruptcy Court who later oversaw the sham Chapter 11 reorganization of Sorrento.

59. In April 2022, Meghji distributed (by U.S. Mail and by email) invitations to a private party at a swanky New York restaurant, Le Bernardin, touting that Chief Judge Jones and another colleague on the Houston bankruptcy court bench, Judge Christopher Lopez, would be guests of honor.

Kutak Rock LLP
Attorneys At Law
Los Angeles

- 13 -

COMPLAINT AND DEMAND FOR JURY TRIAL

60. Upon information and belief, Meghji and M3 were later selected by Ji and Sorrento's Board of Directors to become Chief Restructuring Officer and Financial Advisor in the Sorrento bankruptcy because of their relationship with the Bankruptcy Court.

61. Bankruptcy Court records show that Judge Lopez was initially assigned the Sorrento bankruptcy in February 2023, but Chief Judge Jones then reassigned it to himself.

**D.    Meghji's and M3's Participation in the Fraudulent Sorrento Bankruptcies**

62. Upon information and belief, Defendants Ji, Meghji, M3, and Jackson Walker played critical roles in causing Scintilla and Sorrento's bankruptcies to be filed in the Bankruptcy Court knowing they could capitalize on the romantic relationship between Chief Judge Jones and Freeman that was unknown to the public.

63. In furtherance of the scheme to file under Chapter 11 and create venue in the Bankruptcy Court, the Debtors retained M3 as "Financial Advisor" and Meghji as "Chief Restructuring Officer" of Sorrento to provide "restructuring advisory services" in connection with the bankruptcies.

64. Prior to the Sorrento engagement, neither M3 nor Meghji had any significant biopharma or biotech restructuring experience.

65. After the Sorrento bankruptcy filing, despite M3's and Meghji's lack of biopharma and biotech experience, the Bankruptcy Court entered an Order authorizing the employment and retention of both M3 and Meghji.

66. As payment for their services, Meghji earned up to $225,000 per month in his Chief Restructuring Officer role with Sorrento, and M3 received $12,304,550 in fees as the appointed Financial Advisor.

///

///

KUTAK ROCK LLP
ATTORNEYS AT LAW
LOS ANGELES

- 14 -

COMPLAINT AND DEMAND FOR JURY TRIAL

4906-4721-6185

67. Despite earning such fees, Meghji failed to visit a single Sorrento facility and took inadequate steps to determine the potential value of the assets in the bankruptcy and impeded alternative restructuring and financing efforts that should have and would have allowed Sorrento to quickly exit bankruptcy.

68. At all relevant times, in addition to the undisclosed romantic relationship between Chief Judge Jones and Freeman, the lavish April 2022 dinner and party hosted by Meghji in honor of Chief Judge Jones and Judge Lopez in New York City created an undisclosed conflict of interest for Meghji and M3 and the Bankruptcy Court with respect to the Sorrento bankruptcies.

**E.      Relevant Facts Concerning How the Illicit Romantic Relationship Became Public and Facts Showing the Prior Cover-up**

69. After the filing of the Sorrento bankruptcies, facts began to emerge in news reports in October 2023 concerning the conflicts of interest created by the romantic relationship between Chief Judge Jones and Freeman.

70. While the secret romance became public in October 2023, the Bankruptcy Court and Jackson Walker had been successful in suppressing information concerning the conflict for two-and-a-half years after an anonymous letter (the "Anonymous Letter") dated March 6, 2021 (alleging that Chief Judge Jones and a Jackson Walker partner were in a romantic relationship) was mailed to a litigant who had been seeking to recuse Chief Judge Jones in a bankruptcy proceeding involving McDermott Industries, a large engineering corporation.

71. In the Anonymous Letter, the author stated: "[T]he largest corporations and clients willingly choose to work with [Jackson Walker] lawyers knowing that they will likely have the court and the judge [rule] in their favor."

72. The recipient of the Anonymous Letter immediately emailed a copy to Matthew Cavenaugh of Jackson Walker (who had clerked for Judge Isgur) the same day he received it, and the Anonymous Letter was then delivered to the Chief Bankruptcy Judge's chambers by Jackson Walker.

KUTAK ROCK LLP
ATTORNEYS AT LAW
LOS ANGELES

4906-4721-6185

- 15 -

COMPLAINT AND DEMAND FOR JURY TRIAL

73. After receipt of the Anonymous Letter, Cavenaugh texted his colleague, Veronica Polnick (the Jackson Walker lawyer who later opened the Scintilla UPS box in order to create the fraudulent venue for Sorrento), stating that Freeman and Chief Judge Jones had "been very careful" and had "taken a lot of steps" to protect themselves, "[b]ut the fact they've taken so many steps makes it problematic from a pr standpoint." Polnick (who was also a former law clerk for Chief Judge Jones) responded: "Right. They saw this coming 10 years ago."

74. A Bloomberg Law investigation conducted after the Anonymous Letter became publicly known in October 2023 revealed at least four judges of the Bankruptcy Court kept the contents of the Anonymous Letter sealed, which allowed Chief Judge Jones to successfully suppress efforts for two-and-a-half years to have the extent of his secret relationship investigated and to determine to what extent the relationship had compromised the integrity of the Bankruptcy Court.

75. In fact, the person who received the Anonymous Letter in March 2021 was expressly ordered by the Bankruptcy Court not to publicly discuss the Anonymous Letter's contents.

76. After receiving a copy of the Anonymous Letter, Chief Judge Jones referred the motion for his recusal filed by the recipient of the Anonymous Letter in the McDermott Industries bankruptcy to Judge Isgur.

77. Judge Isgur rejected a request to take depositions in order to investigate the Anonymous Letter's veracity and denied the motion to recuse Chief Judge Jones.

78. After successfully suppressing disclosure of the illicit romantic relationship, Chief Judge Jones continued to ensure that he would either preside over or mediate mega-bankruptcies filed by Jackson Walker, when circumstances required his recusal.

///

///

///

KUTAK ROCK LLP
ATTORNEYS AT LAW
LOS ANGELES

- 16 -

COMPLAINT AND DEMAND FOR JURY TRIAL

4906-4721-6185

**F.     The Conspiracy Giving Rise to the Filing of the Fraudulent Scintilla and Sorrento Bankruptcies**

79. The Sorrento Bankruptcy Petitions were filed after the facts disclosed in the Anonymous Letter were known by the Bankruptcy Court and Jackson Walker, but had been concealed from public knowledge.

80. Keeping the facts disclosed in the Anonymous Letter secret was important to Jackson Walker because the Jones/Freeman relationship was a major precipitating factor in the law firm's meteoric rise to becoming the top bankruptcy law firm practicing before the Bankruptcy Court.

81. Jackson Walker used Freeman's unethical and unlawful back channel to Chief Judge Jones to receive lucrative compensation from the mega-bankruptcies they filed since the time she resigned as Chief Judge Jones's permanent law clerk to become a partner at Jones Walker in 2018.

82. For example, text messages sent in May 2020 reveal the way Freeman as a partner of Jackson Walker manipulated the Bankruptcy Court.  Freeman texted another lawyer at Jackson Walker stating she had contacted Chief Judge Jones three days before the filing of the JC Penney Chapter 11 bankruptcy: "Talked to Jones. He's got us."

83. Text messages exchanged between Jackson Walker lawyers in March 2021 (that have been produced after the facts disclosed in the Anonymous Letter became public in October 2023) further reveal the significance of the secret romantic relationship on Jackson Walker's leverage over the Bankruptcy Court.

84. Freeman stated in a text: "Jones has been softening up for this for a month" and "[w]e are keeping this down loooooooowww[,]" to which another Jackson Walker lawyer replied:  "Got it."

85. These text messages reveal that Jackson Walker was fully aware of Freeman's back channel to Chief Judge Jones and knowingly exploited it.

///

86. Text messages also reveal that Jackson Walker's senior management all "signed off" on a plan to keep the scandal a secret after the Anonymous Letter was received.

87. While Freeman never filed any formal retention application in the Sorrento bankruptcies, Jackson Walker and/or M3's time records reveal that Freeman was in fact directly involved in the Debtors' bankruptcies even after she resigned as a partner of Jackson Walker.

88. These time records reveal that the Debtors consulted Freeman on a number of key issues including a mediation with Dr. Patrick Soon-Shiong (who was the person with whom Ji carried on an ongoing feud resulting in the $175 million judgment that allegedly precipitated the bankruptcy filings) and a number of his companies, including NantPharma, LLC, NantCell, Inc., and Immunotherapy NANTibody LLC (collectively, the "Nant Parties"), and that Ji, Meghji, M3 and Jackson Walker were aware of and/or participated in these consultations with Freeman.

89. The Debtors' bankruptcies were not the only bankruptcy proceedings that were fraudulently manipulated in 2023. In late January 2023, right before the filing of the Debtors' bankruptcies, both Freeman and Chief Judge Jones were in New York City conducting a mediation concerning another mega-bankruptcy (involving GWG) filed in the Bankruptcy Court.

90. Though the GWG mediation was scheduled for two days, it lasted less than four hours. Chief Judge Jones simply informed the parties in attendance that the bankruptcy was no longer going to pursue the goal of reorganization. Instead, the debtor was going to be liquidated.

91. According to the parties in attendance, before any party could inquire or argue in response, Jones advised that the judge overseeing the bankruptcy, Judge Isgur, was an old, dear friend who would do whatever Jones suggested.

///

KUTAK ROCK LLP
ATTORNEYS AT LAW
LOS ANGELES

- 18 -

COMPLAINT AND DEMAND FOR JURY TRIAL

4906-4721-6185

92. Thus, in GWG, there was no Chapter 11 reorganization or a formal conversion to Chapter 7, and Chief Judge Jones simply announced a liquidation, which was later approved by the Bankruptcy Court, all before the Jones/Freeman relationship was publicly disclosed.

93. With respect to Sorrento, on February 11, 2023, two days before the Scintilla and Sorrento Petitions were filed, a Zoom meeting was held between various attorneys (including Jackson Walker), Meghji, M3, Sorrento's Executive Vice President and Chief Financial Officer (Elizabeth Czerepak) and Ji.

94. Czerepak (who had been hired for her years of biopharma C-suite experience) has stated in a sworn affidavit that she did not understand why Sorrento was filing for bankruptcy in Texas, and that when she asked Ji whether this was a proper course of action, Ji informed her that "the law firms know what they are doing and this is the best plan for us."

95. Immediately before the Petition Date, Ji caused a distribution of shares of another Sorrento subsidiary, Defendant Scilex, to be made as a dividend to Sorrento shareholders.  According to the Liquidation Trustee of Sorrento, Scilex owed $290 million to Sorrento, and "[h]ad that money had been paid to Sorrento, the bankruptcy case might not have been necessary."  The Liquidation Trustee stated: "Instead of paying that sum, however, Sorrento converted that $290 million into shares [of Scilex] and, instead of using those shares to pay its creditors, Sorrento improperly distributed [Scilex] shares to Sorrento shareholders."  At all relevant times, Defendant Ji was in control of both Sorrento and Scilex, but the participants in the zoom meeting held February 11, 2023, said nothing and allowed the Scilex/Sorrento bankruptcies to be filed.

96. After the bankruptcies were filed on February 13, 2023, Czerepak was never consulted by Meghji or M3 on any material matters during the restructuring process despite their total lack of experience in the biopharma industry.

///

KUTAK ROCK LLP
ATTORNEYS AT LAW
LOS ANGELES

COMPLAINT AND DEMAND FOR JURY TRIAL

4906-4721-6185

97. This failure to consult with an experienced CFO shows that Meghji and M3 acted in bad faith and was inconsistent with statements made in sworn declarations filed early in the bankruptcy proceedings.

98. For example, Meghji filed a declaration under penalty of perjury stating that prior to commencement of the Chapter 11 cases, "Sorrento had a healthy balance sheet that faced a short-term liquidity crunch," which arose from "a $175 million arbitration award against Sorrento that had been recently reduced to an enforceable judgment."

99. Meghji further represented under oath that because of the entry of this judgment, Sorrento sought bankruptcy relief "to obtain some breathing room, protect its business and seek to maximize value for stakeholders."

100. The financial metrics pertaining to Sorrento supported the initial statements filed in the Bankruptcy Court.

101. The following represents a simplified organizational chart of Sorrento on the eve of the Petition Date in 2023:



Legend:
⭐ Debtor Entity
Green: US Domestic Affiliate
Red: Foreign Affiliate

https://cases.stretto.com/public/x228/12086/PLEADINGS/1208602132380000000044.pdf

(This organizational chart excludes certain other subsidiaries and excludes valuable minority stakes in other public and private companies)

///

///

///

- 20 -

COMPLAINT AND DEMAND FOR JURY TRIAL

KUTAK ROCK LLP
ATTORNEYS AT LAW
LOS ANGELES

4906-4721-6185

102. A sampling of Sorrento's drug, biologics and diagnostic research and development pipeline as of 2022 included:



https://web.archive.org/web/20221210143726/https://sorrentotherapeutics.com/research/pipeline/

(This R&D pipeline illustration excludes multiple other assets including certain phase 2/3 antibodies and antibody-drug conjugates, Sorrento's GMAB antibody library, ACEA small molecule library, cell therapy intellectual property, patent library, drug/biologics manufacturing know-how and facilities, etc.).

COMPLAINT AND DEMAND FOR JURY TRIAL

KUTAK ROCK LLP
ATTORNEYS AT LAW
LOS ANGELES

4906-4721-6185

103. In July 2023, Sorrento and its executive team, in conjunction with its "restructuring" advisors, created a business plan making projections regarding the future revenue of Sorrento.

104. This business plan forecast a projected $2.1 billion in revenue by 2030 based on estimated worldwide sales revenue.

105. Moreover, based on the products controlled by Sorrento, its patents, its R&D pipeline, and other revenue sources, Ji had affirmatively stated that the enterprise value of Sorrento was between $100 billion and $400 billion.

106. Utilizing these numbers, upon entering bankruptcy, Plaintiffs' shares were worth at least $1.2 billion.

**G.    Defendants' Conduct of the Affairs of the Compromised Bankruptcy Court Caused Direct Injury to Plaintiffs**

107. Because the Bankruptcy Court had been ethically compromised and the facts had been suppressed as alleged herein and did not become publicly known until October 2023, Defendants Ji, Meghji, and M3 seized the opportunity to use the compromised Bankruptcy Court to damage Plaintiffs as alleged herein after the bankruptcy petitions were filed in February 2023.

108. After the $175 million adverse arbitration award was issued in late 2022, Ji caused Sorrento and Scintilla to retain Jackson Walker and file the Chapter 11 proceedings in the Bankruptcy Court despite the fact Scintilla was not an operating business and both Sorrento and Scintilla had no business relationships in that venue.

109. Upon information and belief, Meghji, M3, Ji and Jackson Walker knew they could obtain favorable restructuring rulings from the Bankruptcy Court because of the illicit romantic relationship and because Meghji also had a prior relationship with Chief Judge Jones and Judge Lopez as evidenced by the lavish April 2022 party held in their honor in New York City.

///

///

KUTAK ROCK LLP
ATTORNEYS AT LAW
LOS ANGELES

- 22 -

COMPLAINT AND DEMAND FOR JURY TRIAL

4906-4721-6185

110. As a critical part of the fraudulent scheme set forth herein, Jackson Walker then used its unethical back channel to Chief Judge Jones (which included having Meghji and M3 appointed Chief Restructuring Officer and Financial Advisor, respectively, when they had no relevant biopharma experience) that resulted in Ji using the Bankruptcy Court to enable him to misappropriate virtually all valuable assets of Sorrento for the benefit of Ji, Sorrento's de facto controlling shareholder, CEO and Chairman , to the direct injury of Plaintiffs.

111. Defendants Ji, Meghji, M3 and Jackson Walker knew of and participated in the fraudulent scheme to manufacture bankruptcy jurisdiction in the Southern District of Texas and knew that their cases would be assigned to Chief Judge Jones because of Jackson Walker's unethical and improper back channel in the Bankruptcy Court.

112. Indeed, records in the Debtors' bankruptcy case show that Scintilla was first assigned to Judge Lopez but, in furtherance of the conspiracy to commit wrongful acts, as alleged herein, Jackson Walker took steps to ensure that Chief Judge Jones would assign the case to himself.

113. Ji has stated that Meghji and the lawyers "are all together, they all know the system," which gives rise to the reasonable inference that Meghji, M3 and Jackson Walker used their personal relationships with Chief Judge Jones to have *ex parte* communications and force specific negative outcomes for Plaintiffs as alleged.

114. Defendants used the strategically selected, ethically compromised Bankruptcy Court to commit fraudulent acts constituting a pattern of wire fraud, mail fraud, and bankruptcy fraud, as alleged herein, to loot Sorrento of virtually all of Sorrento's valuable assets, causing Plaintiffs to suffer significant damages.

115. Such negative outcomes include, but are not limited to: (1) the Judge Isgur-mediated Nant Parties' settlement where Sorrento gave up a stake in ImmunityBio worth over $400 million; (2) the delayed and diminished size of the

KUTAK ROCK LLP
ATTORNEYS AT LAW
LOS ANGELES

- 23 -

COMPLAINT AND DEMAND FOR JURY TRIAL

4906-4721-6185

ImmuneOncia deal with Yuhan from $50-80 million down to less than $20 million with increased cost burdens for Sorrento when it had planned an initial public offering potentially worth $1 billion months later; (3) *de minimis* asset sales for Sorrento's stakes in Celularity, Elsie, and Cytimm that were sold (over the objection of the Equity Committee members) for an aggregate $5 million when they were worth over $100 million combined in present market value months later; and (4) the failed forced sale to Oramed Pharmaceuticals, Inc. that devalued Scilex Holdings, a Sorrento subsidiary in which Plaintiffs also had an equity stake through their ownership of Sorrento.

116. These transactions, some labelled "cram down" transactions in bankruptcy, were not the "best available" and were adverse to the best interests of Plaintiffs.

117. Defendants Ji, Meghji, M3 and Jackson Walker only pursued the above transactions because Ji held significant interests in the purchasers and/or otherwise personally benefitted from the transactions, and it was in furtherance of the conspiracy to file the bankruptcies in the Bankruptcy Court and loot the assets of Sorrento.

118. Ji has continued participating in the conspiracy without providing any meaningful information as evidenced by the following public disclosure made April 1, 2026:

> "**Scilex Holding Company** (the "Company") has determined that it is unable, without unreasonable effort or expense, to file its Annual Report on Form 10-K **for the fiscal year ended December 31, 2025** (the "Form 10-K") by March 31, 2026, the prescribed due date, because it requires more time to finalize its financial statements to be included in such Form 10-K, including **the consolidation of Vivasor Holding Company**."

https://scilexholding.gcs-web.com/node/10746/html

///

///

KUTAK ROCK LLP
ATTORNEYS AT LAW
LOS ANGELES

- 24 -

COMPLAINT AND DEMAND FOR JURY TRIAL

4906-4721-6185

119. Defendant Jackson Walker knowingly used Freeman's relationship with Chief Judge Jones to back-channel communications with Chief Judge Jones and in furtherance of their scheme to effect an insider sale of Sorrento's assets to Ji or "good friend[s of his]" for pennies on the dollar to the detriment of Plaintiffs.

120. M3 and Meghji were instrumental in allowing the Sorrento assets to be sold for pennies on the dollar, to the detriment of Plaintiffs.

121. While M3 and Meghji created a "data room" (ostensibly to provide access to diligence for potential purchasers of Sorrento assets to evaluate so they could determine whether to make a bid on Sorrento's assets), M3 and Meghji intentionally refused certain potential bidders (which included certain Plaintiffs or their representatives) access to the data room, ensuring that legitimate bids that would properly value the assets were never made in the bankruptcy.

122. Mergers and acquisitions activity for cancer and immune companies has been incredibly strong over the last five years, with comparable companies being sold for hundreds of millions of dollars, up to over $10 billion. Even licensing deals for specific molecules or antibodies have yielded multi-billion dollars for Sorrento's joint development partners Kelun-Biotech, 3SBio, Escugen, etc.

123. Despite that, and as a result of M3 and Meghji's role in the conspiracy, Ji was able to orchestrate low-ball offers to be made for the assets and obtain such assets for pennies on the dollar because legitimate, good-faith purchasers (including certain Plaintiffs) were precluded from conducting diligence and thus making offers on the assets.

124. The manner in which the assets were sold were in violation of fiduciary duties owed to Plaintiffs and pursuant to a pattern of racketeering as alleged herein.

125. As a result of the wrongful acts committed by Defendants as alleged herein, a vast majority of the valuable assets owned by Sorrento ended up under the control of Ji as of late 2023 and early 2024, and Defendants Meghji, M3 and Jackson Walker have been paid exorbitant or unjustified fees and compensation.

KUTAK ROCK LLP
ATTORNEYS AT LAW
LOS ANGELES

- 25 -

4906-4721-6185

126. The injuries to Plaintiffs were caused by, without limitation: (a) the Bankruptcy-mediated Nant Parties' settlement where Sorrento gave up a stake in ImmunityBio worth over $400 million and the future royalties to a promising cancer therapy; (b) the decrease of the size of the ImmuneOncia deal with Yuhan from $50-80 million down to less than $20 million with increased cost burdens for Sorrento when Sorrento had planned a public offering potentially worth $1 billion months later and gave up global rights to multiple antibody therapies worth significantly more; (c) the *de minimis* asset sales of Sorrento's stakes in Celularity, Elsie, and Cytimm that were sold (over the objection of the Equity Committee members) for an aggregate of $5 million when they were later valued at over $100 million; (d) the failed forced sale to Oramed Pharmaceuticals, Inc. where there was undisclosed conflicts that led to the (e) the sale of Sorrento's stake in Scilex and Semnur that was valued at over $3.6 billion based on Semnur's spin-out into a separate public company when both former subsidiaries were able to raise over $320 million in dollars and cryptocurrency in exchange for a small minority of Semnur shares. In less than 2 years, Scilex has been able to pay Oramed over $100 million in cash while freezing any value-creating advancements in its clinical pipeline because of the Sorrento bankruptcy-related misconduct and (f) the fire sale of virtually all remaining Sorrento assets to Vivasor for less than $10 million in cash for therapies worth well over $10 billion, given their successful advancements in clinical trials prior to and during the bankruptcy, resulting in market approval for 3 different cancer indications and 1 antiviral indication.

127. These transactions were adverse to the best interests of Plaintiffs because it resulted in Plaintiffs receiving virtually nothing for their shares in Sorrento that were worth at a minimum $50 to 100 million when the bankruptcies were filed, and, depending on certain valuations prepared with input from Sorrento executives, worth over $1.2 billion in 2023. In contrast, Ji , Sorrento's de facto controlling shareholder,

KUTAK ROCK LLP
ATTORNEYS AT LAW
LOS ANGELES

- 26 -

COMPLAINT AND DEMAND FOR JURY TRIAL

4906-4721-6185

benefited because he is the controlling shareholder of Vivasor, the purchaser of the assets at fire sale prices.

128. Meghji and M3 also actively limited access to the data room, thereby preventing buyers (including several Plaintiffs) who were interested in purchasing Sorrento's assets from performing necessary due diligence.

129. Defendants pursued the above transactions to the detriment of Plaintiffs because Ji held interests in the purchasers and/or otherwise personally benefitted from the transactions.

130. Other avenues to allow Sorrento to exit the Chapter 11 proceeding with all creditors paid and Sorrento's noncontrolling equity holders' interests intact were not pursued by Defendants Ji, Meghji, M3 and Jackson Walker.  For example: (a) a proposal that would have produced $250 million in value to Levena, a Sorrento subsidiary, was blocked by M3 as M3, in an unusual and not customary move, required the full $250 million to be deposited in escrow to simply bid on the entity; (b) an offer to purchase or partly license the GMAB library was rejected without proper analysis; (c) M3 blocked and obstructed legitimate access for bidders to gather necessary information by slow playing approvals of nondisclosure agreements, which allowed Ji to be successful in achieving his fire sale purchase of assets; (d) Plaintiff Asfour was denied access to the data room despite his ability to purchase assets; (e) the lawyer representing the Equity Committee attempted to raise funds with a shareholder rights offering to satisfy the debt but was obstructed by Meghji; and (f) Meghji hid a viable plan offered by Shawn Sahebi, an executive at Sorrento, that would have funded Sorrento's reorganization with no dilution, simply deferring less than $4 million of professional fees (which were over $50 million at the time).

131. Despite all the above, none of which was properly analyzed and considered in the proceedings in the Bankruptcy Court and were based upon the statements in declarations of Meghji and the motion of Jackson Walker, the

KUTAK ROCK LLP
ATTORNEYS AT LAW
LOS ANGELES

- 27 -

COMPLAINT AND DEMAND FOR JURY TRIAL

4906-4721-6185

Bankruptcy Court approved the sale of assets at a price that was a fraction of their fair market value.

**H.    After the Illicit Romantic Relationship Became Publicly Known, the Bankruptcy Court Refused to Transfer or Dismiss the Sorrento Bankruptcy Upon Motion of the U.S. Trustee**

132. After Chief Judge Jones' improper romantic relationship with Freeman became public, he resigned from the bench on October 16, 2023, to avoid further investigation into his wrongdoing.

133. This resignation had followed a formal inquiry by Chief Judge Priscilla Richman of the United States Court of Appeals for the Fifth Circuit that had begun shortly before the resignation, in which it was concluded that "there [was] probable cause to believe that misconduct by [Chief Judge Jones] has occurred" in the Chapter 11 cases he presided over due to the undisclosed romantic relationship.

134. Despite this finding of the Fifth Circuit, the Bankruptcy Court assigned the Sorrento bankruptcy to Judge Lopez (who was also honored at the party in New York City hosted by Meghji in April 2022), and the Bankruptcy Court approved the proposed reorganization of Sorrento on November 30, 2023, which plan became effective on April 10, 2024.

135. Moreover, after the illicit romantic relationship became public and facts were uncovered about the manufactured venue created for the Sorrento bankruptcy, the U.S. Bankruptcy Trustee for the Bankruptcy Court filed a motion stating that the Bankruptcy Court had two options for the Sorrento bankruptcy: dismissal or transfer.

136. This motion was denied by Judge Lopez after conducting a hearing on March 11, 2024, at which Meghji was a critical witness.

137. At no time before or during the hearing did Judge Lopez disclose that he had been honored (together with the now discredited Chief Judge Jones) at a lavish party hosted by Meghji in New York City in April 2022.

///

KUTAK ROCK LLP
ATTORNEYS AT LAW
LOS ANGELES

- 28 -

COMPLAINT AND DEMAND FOR JURY TRIAL

4906-4721-6185

138. In addition, when an Equity Committee member asked Ji questions about the effect of the newly disclosed romantic relationship between Chief Judge Jones and Freeman in November 2023, Ji threatened immediate negative consequences to anyone raising such issues because Meghji had stated that any investigation would be quashed before it began and that the Sorrento bankruptcy would be immediately converted to a Chapter 7 liquidation.

139. In October/November 2023, Meghji also terminated Czerepak as Sorrento's CFO, which removed Sorrento's ability to file the necessary filings with the SEC to preserve Sorrento's public company status.

140. Czerepak's termination was also contrary to representations made by Ji, Meghji and their bankruptcy lawyers about reorganizing "strategically" and to "quickly" exit with "equity intact."

141. In fact, the termination of Czerepak as CFO limited the way Sorrento could be reorganized.  Czerepak's duties as CFO included maintaining Sorrento's status as a publicly traded company with the SEC, and her termination caused Sorrento's status to lapse, forcing Sorrento to transfer to the OTC Expert Market, a designation that limits potential purchasers to institutions and accredited investors. Czerepak's termination, therefore, directly resulted in further devaluation of Sorrento's assets (to a fraction of one penny).

142. The Liquidation Trustee appointed by the Bankruptcy Court has also attempted to justify the refusal of the Bankruptcy Court to transfer the case to another bankruptcy court, stating "[i]f the case were moved to another jurisdiction , there would not have been time or funding to maintain the operations necessary to support the sale."

143. While the U.S. Bankruptcy Trustee's efforts to seek dismissal or transfer of the Sorrento bankruptcies proved to be futile, Defendants Meghji, M3, Ji and Jackson Walker, did not receive a general release from personal liability arising from

KUTAK ROCK LLP
ATTORNEYS AT LAW
LOS ANGELES

- 29 -

COMPLAINT AND DEMAND FOR JURY TRIAL

4906-4721-6185

actions they took during the bankruptcy proceedings if their acts involved willful misconduct, gross negligence, criminal conduct or fraud.

144. When Meghji filed a Declaration in Support of Debtors' Chapter 11 Plan, which culminated in the sale of assets at a fire sale price on March 8, 2024, he expressly referenced this carve-out from future liability, ostensibly to avoid further inquiry into the effect the conflicts of interest identified herein had on the bankruptcy proceedings.

145. Thus, because of the carve-out provision, the bringing of litigation against Defendants Ji, Meghji, M3 and Jackson Walker by Plaintiffs in this action was not precluded when the fire sale price for the Sorrento assets was approved by the Bankruptcy Court in March 2024.

146. Moreover, the Liquidating Trustee appointed by the Bankruptcy Court has rejected requests made by Plaintiffs to file litigation against the Defendants named in this case, offering a myriad of excuses, which indicates an abandonment of the claims.

## II.  CLAIMS FOR RELIEF

### Count I

### Racketeering Influenced Corrupt Organizations Act ("RICO")

### 18 U.S.C. § 1962(c)

### (Against RICO Defendants Ji, M3, Meghji and Jackson Walker)

147. Plaintiff restates and realleges paragraphs 1 through 146 of this Complaint as if fully set forth herein.

148. Defendants Ji, M3, Meghji and Jackson Walker (collectively, "RICO Defendants") are each a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. § 1962(c) and 18 U.S.C. § 1961(3).

149. Defendants each violated 18 U.S.C. § 1962(c) by their respective acts, described in the prior paragraphs and as further described below.

///

KUTAK ROCK LLP
ATTORNEYS AT LAW
LOS ANGELES

- 30 -

COMPLAINT AND DEMAND FOR JURY TRIAL

4906-4721-6185

150. Defendants each had the specific intent to violate 18 U.S.C. § 1962(c) and to commit each underlying predicate act alleged below.

151. Defendants each committed at least two predicate acts of racketeering, as more specifically alleged herein.

152. The acts of racketeering were not isolated; rather, they were related in that they had the same or similar purpose and result, participants, victims, or method of commission.

153. Further, the acts of racketeering have been continuous, spanning the period from at least as early as the first quarter of 2022 and continuing into 2025.

## A.    The RICO Enterprises

154. There are at least three RICO enterprises involved in the present action within the meaning of 18 U.S.C. § 1961(4) that was engaged in and affecting interstate commerce.

155. First, Sorrento, both before and after the Petition Date, until March 2024, was a corporation and is therefore an "enterprise."

156. Second, and alternatively, the Bankruptcy Court constitutes an "enterprise" within the meaning of 18 U.S.C. § 1961(4) that was engaged in and affecting interstate commerce for a common and continuing purpose of providing a fraudulent forum for mega corporate reorganizations.

157. Third, and alternatively, Jackson Walker and the Bankruptcy Court formed an association-in-fact enterprise engaged in and affecting interstate commerce for a common and continuing purpose of taking control of debtors in mega bankruptcies (including Sorrento) and orchestrating asset sales at prices that were a fraction of their fair market value.

158. At all relevant times, there existed one or more enterprises within the meaning of 18 U.S.C. § 1964(4) (hereafter referred to as the "RICO Enterprise").

159. At all relevant times, the RICO Defendants were employed by or associated with each RICO Enterprise, and the RICO Defendants each conducted or

KUTAK ROCK LLP
ATTORNEYS AT LAW
LOS ANGELES

- 31 -

COMPLAINT AND DEMAND FOR JURY TRIAL

4906-4721-6185

participated, directly or indirectly, in the conduct of a RICO Enterprise's affairs through a pattern of racketeering activity as alleged herein.

160. Each RICO Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which the Defendants engaged.

161. The Defendants are central and controlling persons conducting the affairs of each RICO Enterprise and have directed others to take actions necessary to accomplish the overall aims of each RICO Enterprise.

## B.   The Pattern of Racketeering Activity

162. The repeated and continuous violations of federal criminal law alleged in this Complaint constitute a "pattern of racketeering activity" in violation of RICO, 18 U.S.C. § 1961, *et seq.*

163. The Defendants conducted or participated, directly or indirectly, in the conduct of each RICO Enterprise's affairs through a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(1) and (5), consisting of multiple acts of racketeering that are interrelated, not isolated, and perpetrated for the same or similar purposes by the same persons (the "RICO Pattern").

### 1.   *Mail and Wire Fraud, 18 U.S.C. §§ 1341, 1343*

164. Defendants carried out a fraudulent scheme using the mail and wires on numerous occasions in violation of 18 U.S.C. § 1341 and § 1343, and the fraudulent scheme included depriving Plaintiffs of their right to participate in fair and noncorrupted bankruptcy proceedings and the right to object to the fraudulent sale of valuable assets in conflicted transactions.

165. In furtherance of their fraudulent scheme, Defendants continually used the Internet, telephone, U.S. Mail, and other interstate commercial carriers, including as follows:

///

///

///

KUTAK ROCK LLP
ATTORNEYS AT LAW
LOS ANGELES

- 32 -

COMPLAINT AND DEMAND FOR JURY TRIAL

4906-4721-6185

- In April 2022, Meghji and M3 distributed by U.S. Mail and by email invitations to a private party at a swanky New York restaurant, Le Bernardin, touting that Chief Judge Jones and Judge Lopez would be guests of honor.

- Three days before the Petition Date, on February 10, 2023, Ji caused Sorrento to wire $60,000 to a newly opened Signature Bank checking account in the name of Sorrento's inactive Scintilla subsidiary.

- On February 11, 2023, a Jackson Walker lawyer rented a mailbox (the "UPS Mailbox") on Scintilla's behalf at a UPS Store located at 7 Switchbud Place, The Woodlands, Texas, which was used to receive mail.

- Also on February 11, 2023, a Zoom meeting was held between various attorneys (including Jackson Walker), Meghji, M3, Czerepak and Ji.

- The bankruptcies were filed on February 13, 2023, using the electronic filing system provided by the Bankruptcy Court.

- Telephone calls and emails were continuously made and received by Defendants throughout the bankruptcy proceedings on the dates listed in the Bankruptcy Court docket for the Sorrento bankruptcies for a period spanning February 2023 through 2025.

- In March 2023, Meghji directed M3 and counsel to send emails to the United States Trustee to provide requested information about the Debtors' bank accounts and other information relating to the initial Debtor interview, and emails were sent on March 12, 2023.

KUTAK ROCK LLP
ATTORNEYS AT LAW
LOS ANGELES

- 33 -

COMPLAINT AND DEMAND FOR JURY TRIAL

4906-4721-6185

- The wires were used to circulate by email and to file with the Bankruptcy Court the Asset Purchase Agreement dated March 8, 2024, which sale was approved by the Bankruptcy Court on the same date, under which assets were sold at greatly discounted prices ($15.5 million, including outstanding DIP loan and $5 promissory note).

- The RICO Defendants utilized the wires to facilitate Judge Lopez's Order dated March 11, 2024, denying the United States Trustee's Motion to Dismiss or Transfer, thereby keeping the bankruptcy proceedings in the Bankruptcy Court.

- Ji or his agents used the mails and wires in furtherance of transactions and events he described during a recorded telephone call on March 22, 2024, which related to his admitted control of the sale of Sorrento's assets:

> "During the bankruptcy, I helped, you know, identify most of the asset deals. And if we're just listing some of the stuff that, as you know, the Scilex shares was overbid by Scilex, and we provided from the Scilex side the $20 million sub-DIP. And the major sales are probably Yuhan and the Yuhan that deal was brought in by me and negotiated by the CRO…. I identified all of the deals, some of them executed and some of them not. Cellularity the CEO is a very good friend of mine and I facilitated the sale."

KUTAK ROCK LLP
ATTORNEYS AT LAW
LOS ANGELES

- 34 -

COMPLAINT AND DEMAND FOR JURY TRIAL

4906-4721-6185

### 2. *Bankruptcy Fraud*

166. RICO Defendants have committed multiple instances of bankruptcy fraud in violation of 18 U.S.C. § 152(2), 152(3) and 152(6), each of which also constitutes racketeering activity within the meaning of 18 U.S.C. § 1961(1).

167. Under 18 U.S.C. § 152(2), a defendant commits bankruptcy fraud if he or she "knowingly and fraudulently makes a false oath or account in or in relation to any case under title 11."

168. Before October 2023, RICO Defendants committed acts of bankruptcy fraud on multiple occasions by knowingly and fraudulently declaring that they were not "interested parties" in cases before the Bankruptcy Court.

169. For example, Jackson Walker submitted on March 15, 2023, declarations of disinterestedness in the Sorrento bankruptcy, stating it was a disinterested party. Jackson Walker not only failed to disclose the unethical romantic relationship between Chief Judge Jones and Freeman, but in fact affirmatively represented the absence of any conflict of interest with respect to bankruptcy judges in the Bankruptcy Court.

170. The RICO Defendants also committed acts of bankruptcy fraud by continuing to file or authorize the filings of other pleadings and documents, without disclosing the improper romantic relationship and the fraud that was being perpetrated by the RICO Defendants before the relationship became known on October 2023.

171. Under 18 U.S.C. § 152(3), a defendant commits bankruptcy fraud if he or she "knowingly and fraudulently makes a false declaration, certificate, verification or statement under penalty of perjury . . . in or in relation to any case under Title 11."

172. Each RICO Defendant engaged in predicate acts of bankruptcy fraud and conducted the affairs of a RICO enterprise as alleged and the filings in the corrupted

KUTAK ROCK LLP
ATTORNEYS AT LAW
LOS ANGELES

- 35 -

COMPLAINT AND DEMAND FOR JURY TRIAL

4906-4721-6185

Bankruptcy Court caused the fraudulent looting of valuable assets for the benefit of Ji and the payment of exorbitant compensation and fees to the RICO Defendants.

173. Each RICO Defendant committed acts of bankruptcy fraud by explicitly or implicitly representing or acknowledging that Jackson Walker, Ji, Meghji and M3 were disinterested parties despite knowledge of the unethical romantic relationship between Chief Judge Jones and Freeman and the failure to remedy the disastrous effect the bankruptcy fraud had on the proceedings conducted in the tainted Bankruptcy Court and that the entire Sorrento bankruptcy proceedings were fraudulent, causing direct injury to Plaintiffs.

174. Under 18 U.S.C. § 152(6), a defendant commits bankruptcy fraud if he or she "knowingly and fraudulently gives, offers, receives, or attempts to obtain any money or property, remuneration, compensation, reward, advantage, or promise thereof for acting or forbearing to act in any cause under title 11."

175. The RICO Defendants committed or participated in acts of bankruptcy fraud knowing Jackson Walker would receive favorable treatment for Ji in the Bankruptcy Court while they continued to conceal the intimate relationship between Chief Judge Jones and Freeman, and Meghji and M3's hosting the expensive event honoring Chief Judge Jones and Judge Lopez held in April 2022. *See* 11 U.S.C. § 327, 328; Fed. R. Bankr. P. 5002.

**C.     Predicate Acts and Pattern of Racketeering Caused Injuries.**

176. As described herein, the RICO Defendants' commission of RICO predicate acts and the pattern of racketeering was the substantial and proximate cause of injury and damage to Plaintiffs.

177. Further, because RICO Defendants' conduct targeted the federal judiciary and the bankruptcy process in particular, the judiciary's responsibility to maintain and preserve the integrity of the bankruptcy process lessens Plaintiffs' burden to show a direct injury.  The RICO Defendants' commission of the predicate acts and the pattern of racketeering deprived Plaintiffs of their right to have their

KUTAK ROCK LLP
ATTORNEYS AT LAW
LOS ANGELES

COMPLAINT AND DEMAND FOR JURY TRIAL

4906-4721-6185

financial interests litigated or otherwise considered in a fair and impartial bankruptcy forum.

178. As a proximate result of the predicate acts and pattern of racketeering activity alleged herein, including all filings and use of the mails and wires in the Sorrento bankruptcy proceedings held in the corrupted Bankruptcy Court, Plaintiffs have suffered direct damages in an amount to be determined by a jury.

179. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover treble damages plus costs and attorneys' fees from the RICO Defendants.

## COUNT II

### Conspiracy to Violate RICO, 18 U.S.C. § 1962(d)

### (Against RICO Defendants Ji, M3, Meghji and Jackson Walker)

180. Plaintiffs restate and re-allege paragraphs 1 through 179 of this Complaint as if fully set forth herein

181. The RICO Defendants have unlawfully, knowingly and willfully combined, conspired, confederated and agreed together and with others to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

182. The RICO Defendants knew that they were engaged in a conspiracy to commit the predicate acts of mail and wire fraud and of bankruptcy fraud, and the participation and agreement of each of them was necessary to allow the commission of this pattern of racketeering activity.

183. Each RICO Defendant agreed to conduct or participate, directly or indirectly, in the conduct, management, or operation of each RICO Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

184. As a direct and proximate result of RICO Defendants' conspiracy to violate 18 U.S.C. § 1962(d) and the overt acts taken in furtherance of that conspiracy, Plaintiffs have been damaged in their business and property in an amount to be determined at trial.

KUTAK ROCK LLP
ATTORNEYS AT LAW
LOS ANGELES

- 37 -

COMPLAINT AND DEMAND FOR JURY TRIAL

4906-4721-6185

185. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover treble damages plus costs and attorneys' fees from the RICO Defendants.

## COUNT III

## Breach of Fiduciary Duty

## (Against Defendant Ji as de facto controlling shareholder, Chairman of the Board and Chief Executive Officer)

186. Plaintiffs restate and re-allege paragraphs 1 through 146 of this Complaint as if fully set forth herein.

187. At all relevant times, Ji exercised dominion and ultimate total control over Sorrento and its subsidiaries.

188. As de facto controlling shareholder, Chairman of the Board of Directors, and Chief Executive Officer of Sorrento, Ji owed fiduciary duties of due care and loyalty to Plaintiffs and was required to discharge his duties in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner, he reasonably believed to be in the best interests of Plaintiffs.

189. Ji violated the fiduciary duties of care, loyalty, candor, good faith and independence owed to Plaintiffs and has acted to put his personal interests ahead of the interests of Sorrento's noncontrolling shareholders.

190. Ji breached his fiduciary duties as director, officer, or person in control of Sorrento by, among other things, (a) directing the Debtors and their directors and officers in a manner detrimental to Sorrento's noncontrolling shareholders, in violation of his duties of due care, loyalty, and good faith, (b) directing the Debtors and their officers to use corporate assets to acquire properties for his personal benefit, in violation of his duties of due care, loyalty, and good faith; (c) orchestrating the diversion of Sorrento's assets to Ji or entities owned or controlled by Ji in violation of his duties of due care, loyalty, and good faith;

KUTAK ROCK LLP
ATTORNEYS AT LAW
LOS ANGELES

- 38 -

COMPLAINT AND DEMAND FOR JURY TRIAL

4906-4721-6185

(4) entering into purchase transactions without regard to the fairness of the transactions to the injury to Plaintiffs.

191. Ji's breaches of fiduciary duty, including his breaches of due care, loyalty, and good faith, proximately caused Plaintiffs to suffer injury, in an amount to be determined at trial.

## COUNT IV

### Aiding and Abetting Breach of Fiduciary Duty

### (Against Defendants M3, Meghji , Jackson Walker, Vivasor, Scilex and Semnur)

192. Plaintiffs restate and reallege paragraphs 1 through 144 and 186 through 189 of this Complaint as though fully set forth herein.

193. Defendants M3, Meghji and Jackson Walker knew that Ji owed fiduciary duties as de facto controlling shareholder, Chief Executive Officer and Chairman of the Board of Sorrento.

194. Defendants M3, Meghji and Jackson Walker knowingly substantially assisted Ji in violating his fiduciary duties by taking the actions described herein.

195. As set forth herein, Defendants M3, Meghji ,Jackson Walker, Vivasor, Scilex, and Semnur  engaged in substantially assisting Ji in violating his fiduciary duties to advance their own financial and personal interests.

196. As a direct and proximate result of Ji's breach of fiduciary duty and Defendants M3, Meghji and Jackson Walker's aiding and abetting of such breach, Plaintiffs have suffered damages in an amount to be determined at trial.

## COUNT V

### Violation of California Penal Code Section 496

### (Against Defendants Ji, M3, Meghji, Vivasor, Scilex and Semnur)

197. Plaintiffs restate and re-allege paragraphs 1 through 183 of this Complaint as if fully set forth herein.

///

KUTAK ROCK LLP
ATTORNEYS AT LAW
LOS ANGELES

- 39 -

4906-4721-6185

198. Penal Code Section 496(a) provides that "[e]very person who buys or receives any property that has been stolen or that has been obtained in any manner constituting theft or extortion, knowing the property to be stolen or obtained, or who conceals, sells, withholds, or aids on concealing, selling, or withholding any property from the owner, knowing the property to be so stolen or obtained, shall be punished by imprisonment in a state prison, or in a county jail for not more than one year."

199. A criminal conviction under Penal Code Section 496(a) is not a prerequisite to recovery of treble damages under Section 496(e).  The phrase "any manner constituting theft" under Section 496(a) includes theft by fraudulently appropriating property, false pretense, and other statutorily enumerated bases.

200. As of the date of the filing of this Complaint, Defendants Ji, Scilex, and/or Semnur are illegally in possession of an amount to be determined by a jury due to Defendants' fraudulent concealment.  In so doing, the Defendants Ji, Scilex, and/or Semnur knowingly received and concealed Plaintiffs' property.  Further, Defendants Ji, Scilex, and/or Semnur acted with careful planning and deliberation reflecting the requisite criminal intent.

201. As a direct, foreseeable, and proximate result of the violation of Penal Code Section 496(a) by said Defendants, Plaintiffs have suffered damages in an amount to be proven at trial.  Additionally, as a result of the acts of said Defendants, Plaintiffs were forced to retain legal counsel and have incurred legal fees and costs.

202. Pursuant to Penal Code Section 496(c), Plaintiffs bring this action and seek three times the amount of actual damages, interest and all reasonable attorneys' fees.

## COUNT VI

### Breach of Fiduciary Duty

### (Against Individual Directors)

203. Plaintiffs restate and re-allege paragraphs 1 through 146 of this Complaint as if fully set forth herein.

KUTAK ROCK LLP
ATTORNEYS AT LAW
LOS ANGELES

- 40 -

COMPLAINT AND DEMAND FOR JURY TRIAL

4906-4721-6185

204. As directors of Sorrento, the Individual Directors owed fiduciary duties to Sorrento and to its noncontrolling shareholders, including Plaintiffs.

205. The Individual Directors were all beholden to Ji and failed to conduct oversight of Ji when he committed the actions that resulted in the filing of the bankruptcies in the Bankruptcy Court in a forum that had no connection with the business of Sorrento, approving the distribution of the Scilex shares immediately before the Petition Date when they knew the bankruptcy filings would immediately follow, knowing or should have known that Scilex's payment of its $290 million receivable would have obviated any need to file for bankruptcy, and allowing Ji, Meghji and M3 to continue unchecked when they conducted the affairs of Sorrento after the filing of the bankruptcies, when it was obvious that the results achieved in the bankruptcies were disastrous to Plaintiffs, who were noncontrolling shareholders.

206. Moreover, the Individual Directors breached their fiduciary duties before bankruptcy was filed by Sorrento by, among other things:

- Approving a Debt Exchange Agreement pursuant to which Sorrento contributed indebtedness to Scilex (approximately $290 million) in exchange for preferred shares of Scilex with a liquidation preference, payable only in certain circumstances.

- Approving Sorrento's unconditional and irrevocable guarantee, on a senior unsecured basis, to Scilex's heavily discounted offering of its note, causing Sorrento to make at least $91.4 million in cash payments to Scilex between February and September 2022.

- Approving the acquisition of a 50% equity interest in Cytimm Therapeutics, Inc. for $2.5 million. At the time of the investment, Ji was the chairperson of Cytimm's board. As part of the acquisition, Cytimm offered to make Ji CEO of Cytimm and offered him 10% equity in Cytimm.

KUTAK ROCK LLP
ATTORNEYS AT LAW
LOS ANGELES

- 41 -

COMPLAINT AND DEMAND FOR JURY TRIAL

- Approving the acquisitions of Aardvark Therapeutics, Inc., Deverra Therapeutics, Inc., Zhengzhou Fortune Bioscience Co., ACEA Therapeutics, Inc., and Virex Health, Inc., all of which had or resulted in clear conflicts of interest and ultimately benefitted Ji.

- Approving a $10 million investment in Elsie Biotechnologies, Inc. in 2021 for ten million preferred shares, resulting in Ji being appointed to the board of Elsie. Sorrento wrote down its entire $10 million investment in Elsie in 2022, one year after the investment.

207. The above breaches of fiduciary duty were part of the overall conspiracy to position Sorrento for a fraudulent bankruptcy with the goal of funneling all assets to Ji and Vivasor, to the detriment and harm of Plaintiffs.

208. The Individual Directors further breached these fiduciary duties by, among other things, engaging in the conspiracy with Jackson Walker, Ji, Meghji, and M3 to put Sorrento into a fraudulent bankruptcy in Texas in order to allow Ji and Vivasor to "purchase" the Sorrento assets at fire sale prices for their own benefit and to the direct injury and detriment of Plaintiffs.

209. The Individual Directors have engaged in conscious wrongdoing in approving unfair self-dealing transactions as alleged herein and thus breached their duties to Plaintiffs by failing to prevent the harm incurred by Plaintiffs.

210. As a result of the Individual Directors' breaches of their fiduciary duties to Plaintiffs, Plaintiffs have been damaged in an amount to be determined at trial.

### III. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs' seek a judgment against Defendants awarding the following relief: For an award of general damages in the amount to be determined at trial and estimated to be at least $100 million, treble damages pursuant to 18 U.S.C. § 1964(c) and California Penal Code Section 496, disgorgement of monies

KUTAK ROCK LLP
ATTORNEYS AT LAW
LOS ANGELES

- 42 -

COMPLAINT AND DEMAND FOR JURY TRIAL

wrongfully received by Defendants as a result of their wrongful conduct toward Plaintiffs, punitive damages, attorneys' fees, and costs, and for such other relief as the Court deems just and equitable.

Dated:  April 3, 2026                              **KUTAK ROCK LLP**


By: */s/ Bradley P. Boyer*
    Bradley P. Boyer
    Attorneys for Plaintiffs
    ETHAN MEVI, ENRIQUE
    CURBELLO, BRUCE BRADLEY,
    MICHAEL BROOME, CYNTHIA
    BROOME, ALADDIN ASFOUR,
    KYLE HODES,  JENNIFER HODES,
    ALEXANDER ESPALIN, MOAYAD
    ALTAHHAN,  SHAWN FRANZ,
    LEO KISHKO, and AC
    CHOUDHURY

## DEMAND FOR JURY

Plaintiffs hereby demand a jury trial as provided by Rules 38(a) and 38(b) of the Federal Rules of Civil Procedure and Civil Local Rule 38.1.

Dated:  April 3, 2026                              **KUTAK ROCK LLP**


By: */s/ Bradley P. Boyer*
    Bradley P. Boyer
    Attorneys for Plaintiffs
    ETHAN MEVI, ENRIQUE
    CURBELLO, BRUCE BRADLEY,
    MICHAEL BROOME, CYNTHIA
    BROOME, ALADDIN ASFOUR,
    KYLE HODES,  JENNIFER HODES,
    ALEXANDER ESPALIN, MOAYAD
    ALTAHHAN,  SHAWN FRANZ,
    LEO KISHKO, and AC
    CHOUDHURY

KUTAK ROCK LLP
ATTORNEYS AT LAW
LOS ANGELES

- 43 -

4906-4721-6185